**WO**                                                                SKC

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

D.J. Syzmanski,

                Plaintiff,

v.

Centurion Health Incorporated, et al.,

                Defendants.

No.   CV-21-00231-TUC-SHR

**ORDER**

Plaintiff D.J. Syzmanski, who is currently confined in the Arizona State Prison Complex (ASPC)-Phoenix, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 based on Defendants' alleged failures to provide him proper medical care while he was confined at ASPC-Tucson.  Defendants Centurion Health Incorporated (Centurion), Naphcare, Inc. (Naphcare), Nurse Practitioner (NP) Natalie Bell, NP Lara Alonso, ASPC-Tucson Director of Nursing (DON) D. Dennis, and ASPC-Tucson Assistant Director of Nursing (ADON) Jennifer Meyer move for summary judgment.  (Doc. 77.)[1]  The Court will grant in part and deny in part the Motion for Summary Judgment.

## I.   Background

On screening Plaintiff's First Amended Complaint under 28 U.S.C. § 1915A(a), the Court determined Plaintiff stated Eighth Amendment medical care claims in Count Two against Defendants Centurion, NP Bell, NP Alonso, DON Dennis, and ADON Meyer based

---

[1] Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 78), and he opposes the Motion.  (Doc. 82.)  Defendants filed a Reply.  (Doc. 86.)

on their alleged failures to provide treatment for Plaintiff's Hepatitis C Virus (HCV) and directed these Defendants to answer these claims.  (Doc. 19.)[2]

In addition to seeking damages, Plaintiff sought injunctive relief, requiring Defendants to provide him FDA-approved direct acting antiviral (DAA) medications to treat his HCV.  (Doc. 20 at 22.)  The Court joined Naphcare, ADCRR's current contracted healthcare provider, for purposes of injunctive relief only.  (Doc. 49.)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  However, if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute.  In so doing, the nonmovant must show the fact in contention is material—i.e., it would "affect the outcome of the suit under the governing law"—and the dispute is genuine—i.e., the evidence could allow a reasonable jury to return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288−89

---

[2] The Court also found Plaintiff continued to state Eighth Amendment conditions of confinement claims against Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) Director David Shinn and ASPC-Tucson Warden Glen Pacheco in Count One based on their allegedly deficient COVID-19 protocols, as previously found upon screening Plaintiff's original Complaint (*see* Doc. 8); however, these claims and Defendants have since been dismissed on summary judgment (*see* Doc. 81), leaving only Plaintiff's HCV-related claims.

(1968); however, it must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(c)(1)).

At summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth . . . but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

**III.   Facts**

From July 1, 2019, to September 30, 2022, Centurion served as ADCRR's contracted healthcare provider.  (Doc. 75. Defs. Statement of Facts (DSOF) ¶ 2.)

**A.   Centurion's HCV Treatment Policies**

Centurion assessed prisoners for HCV treatment based on fibrosis scores, which measure the level of scar tissue on the liver, and it prioritized those with scores of F3 (advanced or "bridging" fibrosis) and F4 (cirrhosis) for treatment.  (DSOF ¶ 7.)  It also considered those with F1 or F2 fibrosis for HCV treatment if they had a coinfection, such as Hepatitis B (HBV) or HIV, which could increase their health risks or hinder or complicate future treatment of either condition.  (*Id.*)  Patients deemed a high priority for treatment would undergo additional workup to assess for cirrhosis.  (*Id.* ¶ 8.)  Centurion had an HCV Specialist who advised regarding testing and treatment of higher priority patients, and it had an HCV Committee, which additionally reviewed and assessed HCV patients.  (*Id.* ¶ 9.)

According to Centurion's Statewide Medical Director, Dr. Wendy Orm, M.D., Centurion's process for triaging prisoners for HCV treatment was similar to the process used for HCV patients in the outside community and "matche[d] the most recent 'Gold Standard' HCV Guidelines by AASLD/IDSA (American Association for the Study of Liver Diseases and Infectious Diseases Society of America)."  (*Id.* ¶ 10.)

The AASLD/IDSA Guidelines (the Guidelines) state "[a]ll patients with current HCV infection . . . should be evaluated by a healthcare provider with expertise in assessment of liver disease severity and HCV treatment." (Doc. 75-1 at 11.) They also note successful treatment leads to sustained virologic response (SVR), tantamount to a cure, which is "expected to benefit nearly all chronically infected persons." (*Id.* at 13.) As such, the Guidelines state the AASLD/IDSA panel "continues to recommend treatment for all patients with chronic HCV infection, except those with short life expectancy that cannot be remediated by HCV treatment, liver transplantation, or another directed therapy." (*Id.*) The Guidelines also recognize certain populations are especially in need of treatment, including persons with advanced liver disease; persons who have undergone liver transplants; persons at increased risk of rapidly progressive fibrosis and cirrhosis, such as those with HBV or HIV coinfections; and persons with non-liver related symptoms of chronic HCV, including diabetes, fatigue, and dermatologic manifestations. (*Id.* at 15−19.)

The Guidelines no longer include prioritization tables for treatment since the AASLD/IDSA panel recommends treatment for all patients with chronic HCV, but they recognize "[o]ngoing assessment of liver disease is especially important in patients for whom therapy has been deferred." (*Id.* at 13, 23.) They also state "[d]eferral practices based on fibrosis stage alone are inadequate and shortsighted," noting fibrosis progression is based on a variety of factors, such as immunosuppression, and they recommend, for example, "immunocompromised persons should be treated even if they have mild liver fibrosis at presentation." (*Id.* at 23.)[3] "The Guidelines recommend evaluating a patient's liver function and disease progression every six months at a minimum." (DSOF ¶ 11.)

---

[3] Dr. Orm cites generally to pages 8 to 23 of the Guidelines when stating the "updated Guidelines center on testing, evaluation, counseling, and monitoring in situations like the prison setting, and outline monitoring recommendations for those for whom treatment *may be initially deferred* (including patients who have lower fibrosis scores or who are in phases of counseling, assessment, and workup)." (Doc. 75-1 at 2, Orm Decl. ¶ 9 (emphasis added).) This statement is misleading because the Guidelines do not recommend deferred treatment for any populations, and their only substantive discussion of treatment in prison populations is to recognize past barriers to treating HCV-positive

Centurion followed ADCRR's HCV "Clinical Practice Guidelines for the Prevention and Treatment for Viral Hepatitis C," which Dr. Orm avows is consistent with the AASLD/IDSA Guidelines.  (Doc. 75-1 at 2, Orm Decl. ¶ 12.)[4]  Under these guidelines, prisoners who test positive for HCV "will be counseled on the natural history of the disease, potential treatment options, and specific measures for preventing transmission of HCV infection to others, both during incarceration and upon release."  (Doc. 84, Plaintiff's Statement of Facts (PSOF) ¶ 2; Doc. 84-1 at 8.)  They will also be vaccinated against Hepatitis A and B and Pneumococcal pneumonia.  (*Id.*)  Each patient's case submitted by Centurion providers for treatment will be considered for treatment with priority given based on absence of medical contraindications; stage and grade of liver disease; absence of high-risk behaviors, such as drug use or tattoos, for one year; sentence length; and time left to serve.  (PSOF ¶ 4; Doc. 84-1 at 10.)  Prisoners undergoing treatment will have regular, face-to-face meetings with Centurion providers to discuss monitoring, laboratory tests, and check for common side effects, including mental health issues.  (PSOF ¶ 5.; Doc. 84-1 at 11.)

---

prisoners.  These concerns include the lengthy treatment regimens being truncated by release or the toxic effect of treatment regimens being mitigated because "[s]horter HCV treatment duration with DAA reduces stay-related barriers to HCV treatment in prisons" and "the improved safety of DAA regimens diminishes concerns about toxic effects." (Doc. 75-1 at 21.)  While the Guidelines do cover topics such as testing, evaluation, counseling, and monitoring, they preface this discussion by stating these recommendations are "[in] addition to receiving antiviral therapy."  (*Id.* at 9.)  The Court finds Dr. Orm's statement—"[t]reatment deferral is acceptable under the AASLD/IDSA when paired with periodic assessment and testing" (Orm Decl. ¶ 10)—is unsupported.

[4] Dr. Orm states generally ADCRR's guidelines are "consistent with the more detailed updated AASLD/IDSA guidelines for deferred treatment settings," but apart from attaching the ADCRR Clinical Practice Guidelines, Dr. Orm does not set forth any facts about them, and as noted, the latest AASLD/IDSA Guidelines do not discuss deferred treatment settings, so it is unclear what Dr. Orm means by this statement.  (DSOF ¶ 12; Doc. 75-1 at 2, Orm Decl. ¶ 12.)  Dr. Orm also does not identify any provisions of ADCRR's internal guidelines Centurion followed, and Defendants have not produced a copy of Centurion's HCV treatment policies.  The Court has included facts about ADCRR's guidelines from Plaintiff's Statement of Facts.

### B.      Plaintiff's HCV Treatment under Centurion

Plaintiff was diagnosed with HCV in early 2014.  (DSOF ¶ 5.)

On November 1, 2019, Defendant NP Bell saw Plaintiff for a Chronic Care visit for his hypertension (HTN) and HCV, and Bell noted Plaintiff's APRI[5] score from a previous encounter was 0.6, which was lower than the pre-July 2019 "goal" of < 1.45 based on policies predating Centurion's assumption of medical care for ADCRR prisoners.  (*Id.* ¶ 6; Doc. 75-2 at 10.)  Bell noted Plaintiff denied abdominal pain, bloating, blood in urine/stool, or edema; his GI was "soft non tender"; and he had "occas[ional] bouts of loose stool with accidents."  (Doc. 75-2 at 6−7.)  Bell ordered a diagnostic panel and a microalbumin urinary test to take place prior to Plaintiff's next Chronic Care Appointment, which Bell scheduled.  (DSOF ¶ 6.)  Bell also ordered extra bed linen changes for 90 days.  (Doc. 75-2 at 11.)  As a first-line provider, Bell did not have authority to order DAA treatment for prisoners, which was based on fibrosis scores and subject to the approval of the HCV committee.  (DSOF ¶ 28.)

On April 21, 2020, NP Bell saw Plaintiff for his next Chronic Care Appointment, and she noted Plaintiff denied any "abdominal pain, bloating, vision changes, edema, or blood in stool/urine."  (*Id.* ¶ 13.)  Plaintiff disputes he denied these symptoms, and he states he requested HCV treatment and was refused.  (Doc. 83, Pl.'s Controverting Statement of Facts (PCSOF) ¶ 13.)

By this time, Centurion had implemented its HCV guidelines, which prioritized prisoners for treatment based on fibrosis scores, and NP Bell ordered a fibrosure test and diagnostic panel.  (DSOF ¶¶ 14−15.)  The results of the fibrosure test showed a fibrosis score of 0.2, which corresponds to fibrosis stage F0, indicating the absence of any detectable liver scarring due to Hepatitis C.  (*Id.* ¶ 15.)  Based on this result, Plaintiff was not prioritized for HCV treatment.  (*Id.* ¶ 16.)  Plaintiff agrees he was not prioritized for treatment, but he contends the AASLD recommends treatment for all chronic HCV patients

---

[5] APRI stands for "AST-to-platelet ratio index" and "can help determine if patients with HCV have cirrhosis" and "stage the degree of fibrosis."  (Doc. 75-1 at 9, 22.)

regardless of disease stage or risk of progression.  (PCSOF ¶ 16.)

On September 25, 2020, Plaintiff submitted a health needs request (HNR), stating "I have been defecating and there has been blood in my stools.  I am in a lot of pain," and requesting to be moved to a medical unit.  (PSOF ¶ 6; Doc. 84-1 at 17.)  Registered Nurse (RN) Amanda Landeros wrote the plan was to take a stool sample and hemoccult sample, and Plaintiff was scheduled for a sick call.  (Doc. 84-1 at 17, 18.)[6]

On October 8, 2020, NP Bell saw Plaintiff for his next Chronic Care appointment for his HCV, and she noted Plaintiff denied any abdominal pain, bloating, vision changes, edema, or blood in stool/urine.  (DSOF ¶ 17.)  Plaintiff agrees he had this visit, but he states he told Bell he had abdominal pain, bloating, vision changes, edema, and blood in stools/urine.  (PCSOF ¶ 17.)  Bell reviewed the results of Plaintiff's fibrosure test, showing fibrosis stage F0, and she ordered additional labs, a diagnostic panel, HEP C RNA quant, hemoccult, and a repeat fibrosure test and scheduled Plaintiff for his next Chronic Care appointment to continue monitoring the progression of Plaintiff's HCV and to assess his eligibility for treatment.  (DSOF ¶ 17.)

On January 6, 2021, Plaintiff had a repeat fibrosure test, which showed his fibrosis score had increased slightly to 0.26, which corresponds to fibrosis stage F0−F1.  (Id. ¶ 18.)  Based on this result, Plaintiff was not prioritized for DAA treatment.  (Id. ¶ 19.)

On January 23, 2021, Plaintiff submitted an HNR, stating "my gastro-intestinal problem is bad with blood and pain, I need pain meds.  And I need to renew my medical chrono's for pull-ups, wipes, linens, lower bunk, showers, and chair.  Please see me ASAP."  (PSOF ¶ 8; Doc. 84-1 at 19.)  ADON Dennis responded under Plan of Action, "1st HNR addressed has [illegible] GI consult."  (Doc. 84-1 at 19.)

On March 31, 2021, NP Bell saw Plaintiff for his next Chronic Care appointment for his HCV, and, according to Bell, Plaintiff denied any abdominal pain, bloating, vision

---

[6] Defendants did not produce medical records related to Plaintiff's HNRs, and Plaintiff produced only his HNRs and scheduling records, so it is unclear what care Plaintiff received.

changes, edema, or blood in stool/urine.  (DSOF ¶ 20.)  Plaintiff disputes he denied these symptoms.  (PCSOF ¶ 17.)  Bell reviewed the results of Plaintiff's fibrosure test, showing fibrosis stage F0−F1; re-ordered additional labs, including a repeat diagnostic panel; and scheduled Plaintiff for his next Chronic Care appointment to continue monitoring the progression of Plaintiff's HCV and assess his eligibility for treatment.  (DSOF ¶ 20.)

On May 17, 2021, Plaintiff submitted an Informal Complaint seeking DAA treatment.  (DSOF ¶ 45.)  On June 9, 2021, Defendant ADON Danielle Dennis, who is a registered nurse, reviewed and responded to this Informal Complaint, advising Plaintiff there were several factors and criteria he needed to meet before being prescribed DAA medication and his labs had been ordered and would be discussed at his next Chronic Care visit.  (*Id.* ¶¶ 41, 45.)  ADON Dennis was not involved in treating Plaintiff's HCV, and as a first-line provider, she did not have authority to order DAA treatment for prisoners.  (*Id.* ¶ 48.)

On May 21, 2021, Plaintiff submitted an HNR addressed to DON Meyer, stating,

> Just recently, I had a colonoscopy due to blood in my bowels, my polyps are being analyzed.  Daily activities are becoming harder . . . due to my gastro-intestinal problem, I can't control my bowels.  I am in pain.  Last year D.O.N. Palmer ok'd me to go to ADA housing.  Please move me to 7A Medical ADA Housing so I can receive Assistance.  Thank you.

(PSOF ¶ 9; Doc. 84-1 at 20.)  Under "Plan of Action," RN J. Rhodes wrote "Provider Line." (Doc. 84-1 at 20.)

On June 9, 2021, ADON Dennis conducted a no-contact Health Services Encounter in response to another Informal Complaint Plaintiff filed inquiring about the status of his HCV.  (DSOF ¶¶ 41, 43.)  Dennis responded and advised Plaintiff labs would be ordered to continually assess his priority for DAA treatment, and she entered a verbal order for a Hep C RNA Quant test to measure Plaintiff's viral load.  (*Id.* ¶ 44.)

On June 17, 2021, Plaintiff submitted an HNR, stating, "in my stomach near my liver area has been hurting really bad.  I think it has to do with my hep c, please see me and stop my pain and fix my hep c.  thank you."  (PSOF ¶ 10; Doc. 84-1 at 21.)  RN Darryl

Thayer scheduled him for sick call which was held the same day.  (Doc. 84-1 at 21.)

On June 20, 2021, Plaintiff filed a formal grievance requesting DAA treatment for his HCV, and Defendant DON Jennifer Meyer, who is a registered nurse, reviewed Plaintiff's medical records, including the results of his most recent fibrosis test, which indicated fibrosis stage F0−F1, which did not prioritize Plaintiff for DAA treatment under Centurion's HCV treatment guidelines.  (DSOF ¶¶ 30, 34−35.)

On July 22, 2021, DON Meyer responded to Plaintiff's formal grievance, and advised Plaintiff he needed to undergo several diagnostic studies before being prioritized for DAA treatment and he would be seen for periodic Chronic Care visits to monitor the progression of his HCV.  (*Id.* ¶ 36.)  Meyer also explained the HCV committee was responsible for reviewing Plaintiff's case and approving treatment and "[t]his is all managed by [Plaintiff's] provider."  (Doc. 75-3 at 12.)  As a first-line provider, Meyer did not have authority to order DAA treatment for prisoners, which was determined based on fibrosis scores and subject to the approval of the HCV committee.  (DSOF ¶ 39.)

On August 30, 2021, Plaintiff submitted an HNR, stating "I am having abdominal pain, fatigue and headaches.  I am hurting, please help."  (PSOF ¶ 11; Doc. 84-1 at 22.) On September 6, 2021, ADON Dennis scheduled Plaintiff for sick call.  (Doc. 84-1 at 23.)

On September 14, 2021, Plaintiff submitted an HNR, stating, "I feel fatigued and have abdominal pain," and on September 15, 2021, RN Darryl Thayer scheduled him for sick call.  (PSOF ¶ 13; Doc. 84-1 at 24.)

On September 20, 2021, Defendant NP Laura Alonso saw Plaintiff for his next Chronic Care appointment for his HCV and hypertension.  (DSOF ¶¶ 21, 51.)  NP Alonso did not indicate whether Plaintiff had any subjective symptoms at the time.  (Doc. 75-1 at 40.)  She reviewed the results of Plaintiff's fibrosure test, showing F0−F1 stage fibrosis, indicating little to no liver scarring.  (DSOF ¶ 51.)  She also ordered follow-up labs, "including a diagnostic panel, fibrosure test, and HEP C RNA Quant test," to be scheduled prior to Plaintiff's next Chronic Care appointment.  (*Id.* ¶ 53.)  According to NP Alonso, Plaintiff's labs did not prioritize him for treatment under Centurion's HCV treatment

guidelines.  (*Id.* ¶ 54.)  As a first-line provider, NP Alonso also did not have the ability or authority to order DAA treatment, which was based on fibrosis scores and subject to the approval of the HCV committee.  (*Id.* ¶ 55.)

On September 27, 2021, Plaintiff submitted an HNR, stating, "my stomach is constantly upset and I have been having blood in my stools.  please help," and on September 28, 2021, RN Lisa Graybill scheduled him for sick call.  (PSOF ¶ 14; Doc. 84-1 at 25, 26.)

On December 28, 2021, Plaintiff's fibrosure score had decreased slightly to 0.18, which still corresponded to fibrosis stage F0−F1.  (DSOF ¶ 22.)  Based on this result, Plaintiff was not prioritized for DAA treatment.  (*Id.* ¶ 23.)

On March 15, 2022, NP King saw Plaintiff for his next Chronic Care visit for his HCV, and King noted Plaintiff denied any abdominal pain, fatigue, jaundice, or discoloration of stool/urine.  (*Id.* ¶ 24; PCSOF ¶ 24.)  Plaintiff disputes he denied these symptoms and states he told NP King he had abdominal pain, fatigue, jaundice, and blood in stools/urine.  (PCSOF ¶ 24.)  NP King reviewed the results of Plaintiff's fibrosure test, which showed he had F0−F1 stage fibrosis; noted Plaintiff's HCV was under "good control"; scheduled Plaintiff for his next Chronic Care appointment; and advised Plaintiff how to mitigate his risk of HCV infection and complications by avoiding prison tattoos, IV drugs, and certain medications.  (DSOF ¶ 24.)  Plaintiff disputes NP King reviewed ways to mitigate his HCV risks.  (PCSOF ¶ 24.)

On September 8, 2022, Dr. Dennis William saw Plaintiff for his last Chronic Care visit with a Centurion provider, and Dr. William reviewed the results of Plaintiff's fibrosure test, showing F0−F1 stage fibrosis, and ordered a follow-up fibrosure test.  (DSOF ¶ 25.)  The test Dr. William ordered did not take place before September 31, 2022, when Centurion's contract with ADCRR expired.  (*Id.*)  Plaintiff states he told Dr. William he had abdominal pain, fatigue, jaundice, and blood in stools/urine.  (PCSOF ¶ 25.)

**C.    Plaintiff's HCV Treatment Under Naphcare**

On October 1, 2022, Naphcare took over as ADCRR's contracted healthcare

provider.  (DSOF ¶ 57.)  Like Centurion, Naphcare prioritizes HCV-positive prisoners for treatment based on F3 and F4 fibrosis and considers prisoners with F1 and F2 fibrosis for treatment if they have a co-infection, such as HBV or HIV or other comorbidity.  (*Id.* ¶ 58.)  Naphcare has sought to expand HCV treatment to those with F1 and F2 stage fibrosis, but, according to Naphcare Regional Medical Director Dr. Daniel Pacheco, MD, prioritizing prisoners with more serious fibrosis scores for treatment is reasonable.  (*Id.* ¶¶ 59−60.)

On November 22, 2021, Plaintiff submitted an HNR, stating,

> Please refer me to provider: I am part of the Rincon Unit, I have a gastro-intestinal problem where it is harder to control my bowels.  I am diagnosed with ADL's with blood in stools, NP Hans and physical therapist ordered cain (sic), I am using voltaren for nerve pain, [d]ue to injury it is harder to take care of myself, can you look into ADA housing 7A Manzanita or wherever.  Thank you.

(PSOF ¶ 16; Doc. 84-1 at 27.)   ADON Wilson noted a follow-up appointment was scheduled.  (Doc. 84-1 at 27.)

On April 5, 2023, Plaintiff had an abdominal ultrasound, which identified no suspicious liver mass, despite noting a 2 cm cyst on the right lobe, no ascites, and a normal spleen.  (DSOF ¶ 65; Doc. 75-6 at 17; *see also* Doc. 75-6 at 2 (Pacheco Decl. ¶ 13).)  On May 5, 2023, Plaintiff had a fibrosure test, and the results showed a fibrosis score of 0.21, which equates to F0−F1 stage fibrosis.  (DSOF ¶ 61.)  The next day, Plaintiff submitted an HNR, stating, "I have pain in my abdominal area and [am] very tired," and he was scheduled for a sick call.  (PSOF ¶ 17: Doc. 84-1 at 28.)

On May 10, 2023, Naphcare providers approved Plaintiff to begin HCV treatment, and, on May 17, 2023, Plaintiff began receiving the anti-viral medication Mavyret, and he has subsequently competed his 56-day treatment course without complications.  (DSOF ¶¶ 62−63.)  Plaintiff was scheduled for follow up at the Chronic Care Clinic in mid-August 2023, with a separate follow-up scheduled for October 2023 to assess the effectiveness of his HCV treatment.  (*Id.* ¶ 64.)

. . . .

1

2

**IV.    Discussion**

   **A.    Eighth Amendment Legal Standard**

3   To prevail on an Eighth Amendment medical claim, a prisoner must demonstrate

4   "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096

5   (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs

6   to this analysis: an objective prong and a subjective prong.  As to the objective prong, a

7   prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citation omitted).

8   Examples of serious medical needs include "[t]he existence of an injury that a reasonable

9   doctor or patient would find important and worthy of comment or treatment; the presence

10  of a medical condition that significantly affects an individual's daily activities; or the

11  existence of chronic and substantial pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059−60

12  (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133,

13  1136 (9th Cir. 1997) (en banc).

14  As to the subjective prong, a prisoner "must show the defendant's response to that

15  need was deliberately indifferent." *Jett*, 439 F.3d at 1096.  An official acts with deliberate

16  indifference if he or she "knows of and disregards an excessive risk to inmate health or

17  safety; the official must both be aware of facts from which the inference could be drawn

18  that a substantial risk of serious harm exists, and he [or she] must also draw the inference."

19  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "Prison officials are deliberately indifferent

20  to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with

21  medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (citation and

22  internal quotation marks omitted), or when they fail to respond to a prisoner's pain or

23  possible medical need. *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is

24  limited; "an inadvertent failure to provide adequate medical care" or negligence in

25  diagnosing or treating a medical condition does not support an Eighth Amendment claim.

26  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citation omitted); *see Estelle*,

27  429 U.S. at 106 (concluding negligence does not rise to the level of a constitutional

28  violation).  Further, a mere difference in medical opinion does not establish deliberate

indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

The inquiry into a defendant's liability for deliberate indifference "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see also Rizzo v. Goode*, 423 U.S. 362, 370–71, 375–77 (1976).

### B.    Discussion

Defendants do not argue Plaintiff did not have a serious medical need.  Moreover, the undisputed evidence shows Plaintiff was diagnosed with HCV and his condition required regular chronic care visits, individualized medical assessments, laboratory tests, and eventual DAA treatment.  This evidence is sufficient to show Plaintiff's HCV was worthy of comment and treatment and therefore constituted a serious medical need. *McGuckin*, 974 F.2d at 1059−60.  Accordingly, the Court turns to whether the individual Corizon medical Defendants or Corizon as an entity were deliberately indifferent to Plaintiff's serious medical need.

### 1.    Defendants DON Meyer and ADON Dennis

Defendants argue Defendants DON Meyer and ADON Dennis are entitled to summary judgment because their only involvement in Plaintiff's medical care was to respond to his medical grievances seeking HCV treatment, and neither of them denied Plaintiff medical treatment or had the ability to provide him the treatment he requested. (Doc. 77 at 16−17.)

Based on Defendants' evidence, Defendant ADON Dennis addressed Plaintiff's May 17, 2021 Informal Complaint seeking DAA treatment by advising him several factors and criteria had to be met before prescribing DAA medications and explaining labs had been ordered and would be reviewed by a chronic care provider.  (DSOF ¶ 45; Doc. 75-4 at 10.)  This response does not show Defendant Dennis deliberately disregarded Plaintiff's request for HCV treatment.  Dennis was not a chronic care provider, and absent evidence

1  she was aware of facts from which to infer Plaintiff needed immediate antiviral medication,

2  it was not deliberately indifferent for her to ensure Plaintiff was scheduled for his HCV

3  labs and would see a chronic care provider to discuss them.

4       The same analysis applies to Defendant Dennis's June 9, 2021 "no contact" medical

5  encounter in response to Plaintiff's inquiry about HCV treatment, in which the evidence

6  shows Dennis informed Plaintiff labs would be used to continually assess his priority for

7  DAA treatment, and she issued telephone orders for new labs.  (Doc. 75-4 at 1, Dennis

8  Decl. ¶¶ 6–7; Doc. 75-4 at 4–6.)  Taken together, this evidence is sufficient to meet

9  Defendants' initial burden of showing Defendant Dennis was not deliberately indifferent

10  to Plaintiff's serious medical needs.

11       In his Response, Plaintiff produced evidence Defendant Dennis also responded to

12  Plaintiff's HNRs complaining of gastrointestinal issues and requesting medical supplies on

13  January 23, 2021, and complaining of pain, fatigue, and headaches on August 30, 2021.

14  (PSOF ¶¶ 8, 11.)  But in both cases, the evidence shows Dennis took responsive action.  In

15  the first instance, she noted Plaintiff was scheduled for a GI consult (Doc. 84-1 at 19), and

16  in the second instance, she scheduled Plaintiff for sick call.  (*Id.* at 23.)  Although

17  Defendants have not produced any evidence showing what care Plaintiff ultimately

18  received for these complaints, Dennis's responses show she took steps to verify or ensure

19  Plaintiff received follow-up care and do not create a genuine issue of material fact

20  regarding whether Dennis was deliberately indifferent to Plaintiff's serious medical needs.

21  The Court will grant summary judgment to Defendant Dennis.

22       Based on Defendants' evidence, Defendant DON Meyer's only involvement in

23  Plaintiff's HCV care was to respond to Plaintiff's June 20, 2021 Formal Grievance seeking

24  DAA treatment.  (DSOF ¶ 36.)  Like ADON Dennis, Defendant Meyer advised Plaintiff

25  he needed to undergo several diagnostic studies before being prioritized for DAA

26  treatment, and he would be seen for periodic Chronic Care visits to monitor the progression

27  of his HCV.  (*Id.*)  These facts show Meyer did not deliberately disregard Plaintiff's request

28  for DAA treatment; rather, she properly informed Plaintiff his request for treatment

depended on the results of his diagnostic tests, which would be monitored at his Chronic Care visits.  Moreover, there is no evidence Meyer was aware of and deliberately disregarded any immediate serious medical needs outside of those addressed at Plaintiff's periodic Chronic Care visits.  Accordingly, because Meyer was not responsible for monitoring Plaintiff's HCV, Meyer cannot be held liable for any alleged constitutional violations stemming from Plaintiff's alleged lack of proper HCV treatment.  (*Id.* ¶ 39.)

In his Response, Plaintiff produced Defendant Meyer's response to Plaintiff's May 21, 2021 HNR complaining of blood in his bowels, gastrointestinal issues, lack of bowel control, and pain, and requesting to be moved to ADA Housing.  (PSOF ¶ 9; Doc. 84-1 at 20.)  While Defendants did not produce any evidence about whether Plaintiff received proper follow-up care for these complaints, the evidence shows Plaintiff was referred to the provider line.  These facts also do not show Meyer deliberately disregarded any of Plaintiff's complaints and fail to create a genuine issue of material fact regarding whether Meyer was deliberately indifferent to Plaintiff's serious medical needs.  The Court will grant summary judgment to Defendant Meyer.

### 2.    Defendants NP Bell and NP Alonso

Defendants argue Defendants NP Bell and NP Alonso are entitled to summary judgment as Plaintiff's chronic care providers because the medical record shows both providers saw Plaintiff for his HCV, ordered labs, reviewed Plaintiff's labs and test results, and assessed and advised Plaintiff on his eligibility for treatment.  (Doc. 77 at 16.)  They argue, during these visits, neither provider observed Plaintiff complain of or exhibit any physical symptoms of a serious or life-threatening condition, and Plaintiff's April 5, 2022 abdominal ultrasound showed no signs his liver had been adversely affected by his HCV.  (*Id.*)  They also argue, to the extent Plaintiff claims he suffered a constitutional violation based on lack of HCV treatment, neither Bell nor Alonso had the authority or ability to administer HCV treatment on their own and therefore cannot be held liable for failing to provide this treatment.  (*Id.*)

The medical records and declaration evidence Defendants produced of Plaintiff's

Chronic Care visits show Defendant Bell saw Plaintiff for his HCV four times at regular 6-month intervals over 18 months: on November 1, 2019, April 21, 2020, October 8, 2020, and March 31, 2021.  (DSOF ¶¶ 6, 13, 17, 20.)[7]  Each time, Bell reviewed Plaintiff's labs and fibrosure test results, which showed Plaintiff had F0 to F1 fibrosis, meaning little to no liver damage; noted Plaintiff's lack of active symptoms; and scheduled follow up labs to continue monitoring the progression of Plaintiff's HCV.  On this record, Defendants have met their initial burden of showing Bell did not know of and deliberately disregard any serious medical need for Plaintiff to receive HCV treatment.

Plaintiff disputes, though, he never complained of active symptoms, and he asserts he did complain to Defendant Bell on April 21, 2020, October 8, 2020, and March 31, 2021 of abdominal pain, bloating, vision changes, edema, and blood in stools/urine.  (PCSOF ¶¶ 13, 17, 20.)  The Court also takes as true Plaintiff's firsthand assertions in the First Amended Complaint which indicate Plaintiff complained to both Defendants Bell and Alonso about his pain and "active symptoms," and they still refused him HCV treatment.  (Doc. 20 ¶ 18.)[8]  Plaintiff is also entitled to infer Bell was aware of Plaintiff's September 25, 2020 HNR complaining of blood in his stools and of being in a lot of pain, which Plaintiff submitted less than two weeks before his October 8, 2020 Chronic Care visit with Bell.  (PSOF ¶ 6; Doc. 84-1 at 17.)  *See Jett*, 439 F.3d at 1094, 1097 (finding the plaintiff, as the party opposing summary judgment, was entitled to infer the defendant prison doctor was aware of the medical slips the plaintiff continued to submit asking to be sent to a specialist for treatment for a fractured thumb).

Taken together, this evidence calls into question the entries in Plaintiff's Chronic

---

[7] Defendants claimed to attach the medical records of all four chronic care encounters, but the attachment to NP Bell's declaration only contains medical records of the November 1, 2019 and March 31, 2022 visits.  (*See* Doc. 75-2 at 5−20.)

[8] Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

1    Care records and Defendant Bell's avowals in her declaration stating Plaintiff consistently

2    denied any active symptoms.   In her declaration, Defendant Bell also stated, without

3    explanation, at Plaintiff's October 8, 2020 Chronic Care visit, she ordered a hemoccult,

4    which appears to be consistent with Nurse Landeros' plan of care in response to Plaintiff's

5    HNR regarding blood in his stools.  This statement suggests Bell was aware of this issue

6    at the time.  (Doc. 75-2, Bell Decl. ¶ 8; Doc. 84-1 at 18.)  Defendants have not addressed

7    Plaintiff's complaints of active symptoms, including pain and bloody stools, either in their

8    Motion for Summary Judgement or in their Reply.  Nor have they produced any medical

9    record confirming whether Plaintiff had a hemoccult.  Nor have they cited to any medical

10   evidence opining whether Plaintiff's bloody stools or other active symptoms were not

11   indicative of worsening HCV.

12          Construing the available evidence in Plaintiff's favor, the Court finds there is a

13   genuine issue of material fact whether Plaintiff's symptoms called for more immediate

14   HCV treatment than his fibrosis scores alone suggested.  Because there are no records

15   addressing any follow-up testing or treatment for Plaintiff's symptoms, there is also a

16   genuine issue of material fact on whether Defendant Bell knew of and deliberately

17   disregarded this serious medical need.  Additionally, a reasonable jury believing Plaintiff's

18   testimony could find, if left untreated, Plaintiff's reported symptoms were sufficient to

19   support an Eighth Amendment claim.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment

20   applies even to "less serious cases, [where] denial of medical care may result in pain and

21   suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974

22   F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support

23   a § 1983 action);  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("[A]ccess

24   to medical staff is meaningless unless that staff is competent and can render competent

25   care." (citation omitted)); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner

26   does not have to prove he was completely denied medical care).

27          Defendants argue Plaintiff cannot hold Defendant Bell liable for any failure to treat

28   Plaintiff's HCV because Bell did not have "the ability or authority to order or administer

[HCV] treatment on [her] own."  (Doc. 77 at 16.)  It is undisputed, though, as a chronic care provider, Bell was the Corizon medical provider directly responsible for monitoring and assessing Plaintiff's HCV.  Although Centurion's HCV Committee may have been ultimately responsible for reviewing Plaintiff's case and approving DAA treatment, if recommended, the Court finds Defendants' contentions about Bell's lack of responsibility and authority are antithetical to the role of the chronic care provider.  Based on Defendants' evidence, Bell was the Centurion medical provider directly responsible for tracking and assessing prisoners' chronic care issues.  Thus, the Court finds it would be illogical at this juncture to conclude Bell could not have recommend additional testing or treatment for abnormal symptoms or elevated Plaintiff's case for Committee consideration.

The evidence showing both DON Meyer and ADON Dennis routinely referred Plaintiff to his upcoming chronic care appointments to discuss his requests for HCV treatment and Meyer explained to Plaintiff his treatment concerns would be "managed by [his] provider" (*id.*; Doc. 75-3) further suggests Defendant Bell and other chronic care providers had a role in assessing and recommending prisoners for HCV treatment.  Absent any relevant factual assertions or documentary evidence of Centurion's HCV treatment policies in this area, including facts about the roles and responsibilities of HCV chronic care providers and the process whereby a patient's case is brought to the attention of the HCV committee for treatment consideration, the Court cannot conclude Bell was unable or unauthorized to follow up on Plaintiff's symptoms or present recommendations to the HCV committee for possible treatment if she determined Plaintiff's symptoms were indicative of worsening HCV.  Lacking any substantive evidence to resolve these questions of fact, the Court will deny summary judgment to Defendant Bell.

The medical records and declaration evidence of Plaintiff's Chronic Care visits show Defendant Alonso saw Plaintiff for his HCV one time on September 20, 2021. (DSOF ¶ 51.)  At the time, Alonso did not note any subjective symptoms; however, other evidence shows, between Plaintiff's last Chronic Care visit on March 31, 2021, and September 20, 2021, Plaintiff submitted at least four complaints of pain, blood in his stools,

and other gastrointestinal issues he attributed to his HCV.

On May 21, 2021, two months after Defendant Bell last saw Plaintiff and submitted requests for updated HCV tests and a hemoccult, presumably due to Plaintiff's prior HNR and/or verbal reports of bloody stools, Plaintiff submitted another HNR, stating he had a colonoscopy due to blood in his bowels, his daily activities were becoming harder to manage due to his gastro-intestinal problems, he could not control his bowels, and he was in pain.  (PSOF ¶ 9; Doc. 84-1 at 20.)  Then on June 17, 2021, less than one month later, Plaintiff submitted another HNR, stating, "in my stomach near my liver area has been hurting really bad.  I think it has to do with my hep c., please see me and stop my pain and fix my hep c."  (PSOF ¶ 10; Doc. 84-1 at 21.)  A few days later, on June 20, 2021, Plaintiff filed a formal grievance requesting DAA treatment for his HCV.  (DSOF ¶ 34.)  Then, on August 30, 2021, he submitted another HNR, stating "I am having abdominal pain, fatigue and headaches.  I am hurting, please help."  (PSOF ¶ 11; Doc. 84-1 at 22.)  Finally, on September 14, 2021, just one week before his Chronic Care visit with Defendant Alonso, Plaintiff submitted an HNR, stating "I feel fatigued and have abdominal pain." (PSOF ¶ 13; Doc. 84-1 at 24.)

As above, Plaintiff is entitled to infer Defendant Alonso was aware of this consistent pattern of complaints since Plaintiff's previous Chronic Care appointment.  *See Jett*, 439 F.3d at 1094, 1097.  Still, she did not note any subjective complaints when she saw Plaintiff, and she only ordered repeat HCV labs to be scheduled prior to Plaintiff's next Chronic Care visit, without recording whether she addressed Plaintiff's physical symptoms.  For the reasons already discussed concerning Defendant Bell, there are genuine issues of material fact whether these symptoms were connected to Plaintiff's untreated HCV and whether Alonso's failure to address them was deliberately indifferent to Plaintiff's serious medical needs, causing Plaintiff to undergo unnecessary pain and suffering while he awaited HCV treatment.  Due to these questions of fact, the Court will deny summary judgment to Defendant Alonso.

. . . .

### 3.     Centurion

To maintain a claim against Defendant Centurion as a private entity fulfilling a public function, Plaintiff must meet the test articulated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Accordingly, Centurion can only be held liable under § 1983 for its employees' civil rights deprivations if Plaintiff can show an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, Plaintiff must demonstrate the following: (1) he was deprived of a constitutional right; (2) Centurion had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110 (9th Cir. 2001). The Court has already found there are questions of fact regarding whether Plaintiff suffered a constitutional violation, so Plaintiff's *Monell* claim against Centurion rests on whether Centurion had a policy, whether the policy was deliberately indifferent to his serious medical needs, and whether this policy was the moving force behind the constitutional violation.

Defendants argue Plaintiff cannot make these showings because the record shows Centurion and its providers continually monitored and assessed Plaintiff's eligibility for DAA treatment under Centurion's fibrosis-centered prioritization guidelines, and Plaintiff's fibrosis scores never progressed enough to qualify him for treatment under those guidelines. (Doc. 77 at 18.)

The evidence shows Plaintiff was continually monitored for his HCV, with Chronic Care visits and regular laboratory tests, including new fibrosis tests every 6 months, and his fibrosis score never rose to F3 (bridging cirrhosis) or F4 (cirrhosis), which would have qualified him for treatment under Centurion's policies. As noted, though, there are genuine issues of material fact about whether Plaintiff's chronic care providers ignored other known medical issues, including Plaintiff's verbal reports and repeated HNRs complaining of pain

and bloody stools.  There are also genuine issues of material fact whether these symptoms related to or called for further investigation of his HCV.  Defendants have not addressed these symptoms or produced medical records of any follow-up tests from which to conclude these symptoms were unrelated to his HCV and did not require priority treatment.

Defendants have also not produced Centurion's HCV policies or any declarations about them.  Accordingly, they have not shown Centurion required chronic care providers or the HCV Committee to consider prisoners' physical complaints when assessing their need for HCV treatment.  Absent any evidence or discussion of these issues, there are genuine issues of material fact regarding whether Centurion's HCV policies were deliberately indifferent to Plaintiff's serious medical needs and whether this was the moving force behind Plaintiff's alleged injuries.

Defendants further argue Plaintiff cannot make these showings because the HCV treatment guidelines Centurion followed have already been upheld by courts in this district as constitutional, and "the policies and guidelines that Centurion and ADCRR [] implemented with respect to Hepatitis C treatment are the Gold Standard for triaging and treating patients with Hepatitis C in a correctional setting."  (Doc. 77 at 18.)

These arguments are unpersuasive because, as previously noted, Dr. Orm's claim—Centurion's HCV treatment policies matched the AASLD/IDSA's latest HCV Guidelines and those are the "Gold Standard"—is vague and unsupported, especially where Defendants have not produced Centurion's policies and rely only on limited and mostly generalized statements about them.  Consequently, when attempting to apply Centurion's policies to the facts in this case, the Court is "hamstrung by an undeveloped record."  *See Flahive v. Corizon Health Servs.*, No. CV 19-04834-PHX-DWL(MHB), 2020 WL 3050564, at *5 (D. Ariz. June 8, 2020) (denying summary judgment to prison healthcare providers on prisoner's HCV-based *Monell* claim where the Defendants "did not actually submit a copy of their guidelines or the AASLD/ISDA Guidelines" on which they relied to show they were entitled to summary judgment).

The District of Arizona cases Defendants rely on to argue, in effect, Centurion's

1    HCV policies are per se constitutional also do not help Centurion. (*See* Doc. 77 at 14, 18
2    (citing cases).)  The defendant prison healthcare providers in those cases all relied on the
3    now-outdated May 2018 AASLD/ISDA Guidelines as well as other materials and policies
4    Defendants have not produced or argued are relevant here.  Defendants' citations to
5    additional district court cases in this Circuit (*see* Doc. 77 at 15−16) also do not help
6    Centurion because these cases date back even earlier, to 2012 and 2014.  These cases
7    cannot account for the changes in treatment standards and DAA regimes, which caused the
8    AASLD/ISDA to update and revise its previous HCV treatment recommendations,
9    including eliminating its priority treatment tables.  Moreover, simply citing to rulings in
10   favor of prison healthcare providers in past cases without producing Centurion's relevant
11   HCV treatment policies or addressing the relevant evidence here does not satisfy
12   Defendants' initial burden of identifying the undisputed material facts in support of their
13   Motion and showing Corizon is entitled to judgment as a matter of law.  *See Flahive*, 2020
14   WL 3050564, at *5.

15       Because there are triable issues of fact whether Plaintiff suffered a constitutional
16   violation, whether Defendant Centurion had deliberately indifferent HCV policies, and
17   whether the policies were the "moving force" behind Plaintiff's alleged harm, the Court
18   will deny summary judgment to Defendant Centurion.

19                    **4.    Naphcare**

20       Defendants argue Naphcare must be dismissed because it was added solely to
21   provide injunctive relief, which must be based on current conditions, and the evidence
22   shows Plaintiff was approved for, received, and has since completed DAA therapy.
23   (Doc. 77 at 19.)  Plaintiff agrees he received DAA treatment on May 17, 2023, and he has
24   since completed treatment. (PCSOF ¶ 63.)  Because this treatment moots Plaintiff's request
25   for injunctive relief, the Court will dismiss Naphcare.

26   . . . .

27   . . . .

28   . . . .

Accordingly,

**IT IS ORDERED**:

(1)     Defendants' Motion for Summary Judgment (Doc. 77) is **GRANTED IN PART** as to Defendants Dennis and Meyer, and these Defendants are **DISMISSED** with prejudice.

(2)     Defendants' Motion for Summary Judgment (Doc. 77) is otherwise **DENIED**.

(3)     Defendant Naphcare, which was joined solely for injunctive relief, is **DISMISSED**.

(4)     The **remaining claims** in this action are Plaintiff's Eighth Amendment medical care claims against Defendants Bell, Alonso, and Centurion.

(5)     This action is randomly referred to Magistrate Judge Michael A. Ambri to conduct a settlement conference.

(6)     Defense counsel shall arrange for the parties to jointly call Magistrate Judge Ambri's chambers at (520)-205-4500 within 14 days to schedule a date for the settlement conference.

Dated this 29th day of March, 2024.

Honorable Scott H. Rash
United States District Judge